**U.S. Department of Labor**

Office of the Assistant Secretary
for Administration and Management
Washington, D.C. 20210

July 14, 2008

MEMORANDUM TO: LISA FIELY
Deputy Chief Financial Officer

FROM: Ronald J. Jordan
Contracting Officer

SUBJECT: Response to Deloitte Protest – Integrity of the Procurement System

This memorandum addresses one of the various factors that the Court of Federal Claims has considered when reviewing an agency's decision to override an automatic stay of a federal procurement resulting from a bid protest. Specifically, this memorandum addresses factor number 4 articulated in *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181: the impact of the override on the competition and integrity of the procurement system.

Background

Currently, the DOL's financial management functions, processes, and activities are distributed across multiple information systems and financial applications, all centered on the Department of Labor Accounting and Related Systems (DOLAR$) mainframe accounting system. DOLAR$ has been in service since 1989 and has been both enhanced and extended to meet Departmental and external requirements. While DOLAR$ has served DOL well over its history and continues to exceed its intended useful life, the DOLAR$ technology is antiquated and no longer able to efficiently and effectively meet DOL's financial management requirements. DOLAR$ was implemented prior to all of the modern day laws and regulations that drive Federal accounting, financial management systems, financial management reporting and security, such as: the Chief Financial Officers Act of 1990, the Government Performance and Results Act of 1993, the Federal Financial Management Improvement Act of 1996, the Reports Consolidation Act of 2000, and the Federal Information Security Management Act (FISMA) of 2002.

DOL planned this acquisition, further, in compliance with all applicable financial systems regulations and guidance. DOL planned to migrate from DOLAR$ to a new core financial management system hosted at either an OMB-designated Federal Financial Management Shared Service Provider (FM SSP) or an approved commercial FM SSP, in accordance with OMB policy[1]. OMB is the Executive Sponsor of the Financial Management Line of Business (FMLOB), a Federal Government-wide initiative to improve federal financial management by leveraging common standards and shared solutions and fostering efficiencies in Federal financial management. OMB executes their Executive Sponsor role via the Financial Systems Integration Office (FSIO), which has direct responsibility for completing FMLOB priority projects. One FMLOB project is the migration of agency financial management systems from legacy

---

[1] OMB Memorandum, subject: Competition Framework for Financial Management Lines of Business Migrations, dated May 22, 2006.

Department systems (such as DOL's DOLAR$) to a federal or a commercial FM SSP. FSIO's Migration Planning Guidance, for that project, was the foundation of our acquisition activity for NCFMS.

DOL released on January 15, 2008, Request for Proposal (RFP) DOL089RP20497 on Federal Business Opportunities (FBO) for the purpose of obtaining the services of a FMLOB Shared Service Provider (SSP) to modernize DOL's core financial functions to the New Core Financial Management System (NCFMS). In response to this RFP, DOL initially received nine proposals on the RFP closing date of March 7, 2008. One of these proposals was ultimately withdrawn, and two others were later eliminated due to DOL being notified of the inability of FSIO to certify Oracle Federal Financials Release version 12 software within DOL's required timeframe to make an award, leaving six proposals in the competition. As explained further in this memorandum, after detailed evaluation, DOL selected and issued an award to GCE on June 26, 2008. Deloitte Consulting LLP filed a bid protest with the Government Accountability Office (GAO) (B-400319.1) on June 30, 2008.

<u>DOL Adherence to the Procurement Process</u>

When the RFP was released, prospective offerors were notified of the methodology to be used in conducting the evaluation of proposals received in response to the RFP. That methodology was clearly defined in Section M of the solicitation (Attachment A), and followed the guidance provided at FAR 15.304, and clarifications to the evaluation methodology were issued via amendments to the solicitation (Attachment B), during the question and answer phase of the solicitation (prior to the date the solicitation was scheduled to close).

In order to conduct an efficient and effective evaluation, DOL established a well qualified team of evaluators and advisors which totaled 15 individuals. The Source Selection Evaluation Board (SSEB) was comprised of a Past Performance Team consisting of three evaluators and one advisor, a Technical and Management Team consisting of five evaluators and one advisor, and a Price Team, consisting of a warranted Contracting Officer and one advisor. In addition, and overall Technical Team Lead (Past Performance and Technical) was appointed as well as an overall advisor, and the SSEB Chair. Professional certifications held by the SSEB Chair, Team Leads, evaluators, and advisors include 3 Certified Public Accountants (CPA) and 3 Project Management Professionals (PMP).

Through coordination with both the Contracting Officer and the Office of the Solicitor (SOL), the evaluation of all offers was conducted independently and in strict accordance with the evaluation factors and methodology established in the Solicitation and the "proposal evaluation" guidelines set forth in FAR 15.305. The SSEB evaluators, independently evaluated the initial proposals received and the Contracting Officer, along with the NCFMS team members, entered into negotiations with those offerors found to be within the competitive range in accordance with FAR 15.306(d). The negotiations conducted with each of these offerors consisted of an Operational Capability Demonstration (OCD) which required offerors to demonstrate that they can provide well-qualified staff, Oracle Federal Financials software, and all applicable services to meet the objectives and requirements contained in the solicitation. Per the solicitation, DOL provided the following guidance:

> Those offerors selected to participate will be provided rules, guidelines, content and materials requirements, and other instructions for the Orals and OCDs, as well as a set of scenarios that must be demonstrated to DOL during OCDs. OCD scenarios will focus on DOL's unique requirements and other functionality that represent current areas of challenge for DOL. Initial guidelines for the Orals and OCDs will be distributed at the time of establishment of the competitive range. The scenarios that must be demonstrated to DOL during the OCDs will also be included.

Prior to Deloitte's OCD session with DOL, initial guidelines (Attachment C) were provided to Deloitte (as was with all offerors), which was then followed with the scenarios that were to be demonstrated, and questions that were required to be answered in writing and provided to DOL prior to the OCDs taking place (Attachment D). The offerors were instructed to be prepared to discuss the questions provided to them, during the discussion session (Attachment E).

Upon the conclusion of each offerors OCD/Discussion session, offerors were requested to submit their Final Proposal Revisions (Attachment F). The SSEB then convened again to reach consensus on the Final Proposal Revisions, which was presented to the Contracting Officer in their Final Evaluation Report (FER) (Attachment G). From the results of that evaluation, and after the Contracting Officer was able to make the determination that only one vendor (GCE) had a likelihood of receiving an award, and therefore, in accordance with FAR 15.306(c)(3) and 15.306(d)(5), all other offerors were excluded from the competitive range. As indicated in the Solicitation, DOL would conduct a pre-award Integrated Baseline Review (IBR).

The objective of the IBR, as stated in the solicitation, was for the Government and the Contractor to jointly assess technical areas, such as the Contractor's planning, to ensure complete coverage of the contract requirements, logical scheduling of the work activities, adequate resources, methodologies for earned value (Budgeted Cost for Work Performed (BCWP)), and identification of inherent risks. GCE, as the only offeror remaining in the competitive range, was notified that it was required to participate in the IBR. Upon conclusion of the IBR, and after GCE was requested to submit its Final Proposal Revision, incorporating any agreed upon aspects of the IBR, the SSEB made its recommendation to award a contract to GCE. The Contracting Officer agreed with the recommendation and GCE was notified on June 26, 2008 that their offer had been accepted.

<u>Communication with Deloitte After the End of Discussion</u>

Deloitte has argued that it "[r]eceived no further communication from DOL until being notified of its exclusion from the competitive range by letter dated June 16, 2008." This statement is untrue as DOL, upon completion of the discussion session with Deloitte, requested on May 29, 2008 (see Attachment F), that Deloitte submit its Final Proposal Revision to include, in addition to other information:

> questions already posed, both before and at the meeting; your answers to those questions, both before and during the meeting, and our discussion during our

> Proposal Review/OCD session when preparing final revisions to your proposals. In particular, please 1) consider the question on single set of books versus multiple sets of books and single organization versus multiple organizations, in light of our discussion, and provide and rationalize your best recommendation, including capabilities of your "standard configuration", if any, that may not be available with your final proposed option; and 2) provide your best recommendation on implementing R12 (assuming approved by FSIO) or R11i by our required completion date of October 1, 2009.
>
> Please take these as well as the other questions we posed, which you have answered in writing or at the meeting or both, into consideration

Deloitte was also notified that "DOL expects you to provide your final revisions at this time, although DOL reserves the right to request additional clarifications, if warranted." This statement informed Deloitte that additional information would only be requested if DOL found that it was warranted.

Price Realism Analysis

Deloitte has also accused DOL of making an "award to the sole offeror remaining in the competitive range after excluding all others, without having conducted a price realism analysis."

As stated in the Solicitation, "The Government may evaluate cost realism with regard to the ability of the offeror to meet objectives and requirements in terms of skills required, complexity of disciplines, and job difficulty if the Government deems such analysis necessary." Further, in accordance with FAR 15.404-1(d)(3), cost realism analyses may be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls.

Both the Solicitation and FAR 15.404-1(d)(3), is very clear that there is absolutely no ***requirement*** for a price realism analysis to be performed under a firm-fixed price contract. A price realism analysis ***may*** have been conducted had DOL questioned GCE's proposal in terms of the factors stated in the solicitation and FAR 15.404-1(d)(3), however; the evaluation of GCE's proposal and discussions held with GCE gave DOL no indication of any of these factors, and therefore a price realism analysis was not conducted, which is fully in compliance with both the Solicitation and the FAR.

Deloitte is Not an Interested Party

Overriding the stay, and continuing with contract performance, will not harm the integrity of the procurement process. Only one of the 5 unsuccessful offerors has protested before GAO, although 5 offerors received debriefings in this matter. The only offeror to file a protest was Deloitte, whose technical proposal was the lowest-rated of all the proposals, and whose offered price was almost twice as high as the awardee's.

This puts Deloitte well out of range to be eligible for this award. Even if all of the evaluation errors it alleged were to be resolved in its favor, its proposal still would not be rated high enough, or priced low enough, to displace the awardee. In fact, if its challenge to the awardee's price were to be upheld, the effect would be to give the award to the second-ranked offeror, not to Deloitte.

It would do more harm to the procurement process for an offeror with little to no stake in this procurement to bring it to a halt, simply to obtain a resolution of issues that can have no consequence for the award decision. Put simply, Deloitte is not an "interested party" to bring this protest or to seek a halt to contract performance.

If contract work proceeds, the GAO will still be able to resolve the protest within its statutory 100 days, and if the GAO determines that GCE was improperly awarded the contract, it can recommend a course of remedial action. DOL can always order GCE to stop work while it takes that action.

Conclusion

DOL has taken great pride in the time its staff has dedicated to ensuring this procurement was conducted in accordance with regulation, and is very confident that, upon review by the Government Accountability Office, the protest submitted by Deloitte will be dismissed. DOL conducting this procurement in accordance with both the Solicitation and the FAR has preserved the integrity of the procurement system and its processes.